ORIGINAL

FILED
SEP 11 2006
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| UNITED AIR LINES, INC.<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | Civil Action No. 06-641 C |

## COMPLAINT

This action is brought under the Tucker Act, 28 U.S.C. § 1491(a)(1), by Plaintiff United Air Lines, Inc. ("United") against Defendant the United States of America (the "Government"), for the recovery of sums illegally exacted by the Government under the purported auspices of statutory and regulatory authority requiring airlines to collect Immigration User Fees and Animal and Plant Health Inspection Service User Fees from international passengers. These amounts were illegally exacted under the Government's mistaken assertion that the statutes and regulations in question also grant the Government the authority to force carriers themselves to pay any user fees that are not collected from passengers. This case presents the same issues that have previously been decided in favor of American Airlines by this Court in *American Airlines, Inc. v. United States*, 68 Fed. Cl. 723 (2005).

### Jurisdiction

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).



639986.1

**Parties**

2. Plaintiff United is a corporation formed under the laws of Delaware and having its principal place of business in Elk Grove Township, Illinois.

3. Defendant is the United States of America, acting with respect to the Immigration User Fee through the Department of Justice, Immigration and Naturalization Service ("INS") and through the Department of Homeland Security, Immigration Office of Financial Management and Customs and Border Protection since the inclusion of the INS within the Department of Homeland Security in 2002 until the present; and with respect to the APHIS User Fee through the United States Department of Agriculture, Animal and Plant Health Inspection Service ("APHIS").

**Immigration User Fee Scheme**

4. The Government is responsible for immigration services within the United States. Such immigration services include inspection of arriving commercial airline passengers and detention, transportation, hospitalization and all other expenses of detained aliens.

5. To fund the expenses relating to such immigration services, Congress passed the 1986 Immigration User Fee Statute, codified at 8 U.S.C. § 1356 ("the Immigration User Fee Statute"). By enacting the Immigration User Fee Statute, Congress transferred the responsibility for all immigration service costs to the Government through the creation of the Immigration User Fee Account under the Government's exclusive control.

6. The Immigration User Fee Statute established the Immigration User Fee as a means to fund the Government's Immigration User Fee Account by assessing a fee on each passenger that is seeking transportation by a commercial aircraft into the United States.

7. The Immigration User Fee Statute places sole monetary responsibility on the passenger and requires entities issuing tickets to individuals for such transportation to collect the Immigration User Fee from that individual at the point-of-sale of such ticket.

8. If a ticket for transportation is issued in a foreign country and/or the Immigration User Fee has not been collected by a travel agent or the ticketing carrier at the point-of-sale, the Immigration User Fee Statute provides for collection of the Immigration User Fee by the enplaning commercial airline carrier providing return transportation to such passenger out of the United States at the time of such departure from the United States.

9. The Immigration User Fee Statute, and its implementing regulations, require Immigration User Fee collectors (either ticket issuers or carriers) to remit to the Government the balances of collected Immigration User Fees on a quarterly basis. Remitted Immigration User Fees are then deposited by the Government into the Immigration User Fee Account.

10. The amount of the Immigration User Fee is set by the Government. It is currently $7 per passenger, and has been since 2002. For all other times relevant to this case, the fee was $6 per passenger.

**APHIS User Fee Scheme**

11. The Government is also responsible for agricultural quarantine and inspection ("AQI") services provided in connection with the arrival of international air passengers into the customs territory of the United States or the preclearance or preinspection of international air passengers at a site outside the customs territory of the United States.

12. To fund the expenses relating to such AQI services, Congress passed Section 2509 of the Food Agriculture, Conservation and Trade Act of 1990, as amended by the Omnibus

Budget Reconciliation Act of 1990, codified at 21 U.S.C. § 136a (the "APHIS User Fee Statute"). By enacting the APHIS User Fee Statute, Congress placed the responsibility for all AQI service costs on the Government through the creation of the Agriculture Quarantine Inspection User Fee Account, which until September 30, 2002, contained all APHIS User Fees collected, including late payment penalties and interest charges. The Government has remained in exclusive control of the Agriculture Quarantine Inspection User Fee Account throughout its existence. After September 30, 2002, the APHIS User Fee Statute provides that all APHIS User Fees collected shall be credited to the Department of Agriculture accounts that incur the costs associated with the provision of AQI services, over which the Government also maintains exclusive control.

13. The APHIS User Fee Statute permits but does not require the Secretary of Agriculture to prescribe and collect fees sufficient to cover the cost of providing AQI services in connection with the arrival of international air passengers into the customs territory of the United States from a foreign location by a commercial aircraft or the preclearance or preinspection of international air passengers at a site outside the customs territory of the United States. The APHIS User Fee Statute specifically places limits on the assessment of APHIS User Fees by providing that the amount of APHIS User Fees assessed shall be commensurate with the costs of AQI services with respect to the class of persons or entities paying the fees.

14. On or about April 12, 1991, the Secretary of Agriculture promulgated regulations, currently codified at 7 C.F.R. § 354.3(f) (the "APHIS User Fee Regulations"), requiring that any person who issues tickets on or after May 13, 1991, is responsible for collecting an APHIS User

Fee from all persons (subject to certain exceptions enumerated in the regulations) transported into the customs territory of the United States at the point-of-sale of such ticket.

15. If a ticket for transportation is issued in a foreign country and/or the APHIS User Fee has not been collected by a travel agent or the ticketing carrier at the point-of-sale, the regulations provide for collection of the APHIS User Fee by the enplaning commercial airline carrier providing return transportation to such passenger out of the United States at the time of such departure from the United States. 7 C.F.R. § 354.3(f)(4)(B).

16. The APHIS User Fee Regulations require APHIS User Fees collectors (either ticket issuers or carriers) to remit to the Government the balances of collected APHIS User Fees on a quarterly basis.

17. The amount of the APHIS User Fee is set by the Government. Currently, and since October 1, 2005, the fee is $5 per passenger. From January 1, 2005, until September 30, 2005, it was $4.95. From October 1, 2001, until December 31, 2004, it was $3.10 per passenger. From January 1, 1993, until September 30, 2001, the fee ranged from $1.45 to $3.10 per passenger.

**<u>Fee Collection Difficulties</u>**

18. Despite the collection requirements imposed on United, collections of the Immigration User Fees and the APHIS User Fees at the point-of-sale in certain foreign countries was problematic under local laws of certain countries, particularly in Latin America, or was otherwise difficult to enforce, *e.g.*, with travel agencies who issue tickets and may unilaterally waive collection.

19. The enplaning carrier's ability to collect the Immigration User Fee and the APHIS User Fee in these instances is further restricted by United States law. For instance, neither of the statutes at issue, nor their respective regulations, require or authorize a carrier to deny boarding to a passenger who does not pay his or her user fees. Nor is there any other authority for a carrier, or even a federal official, to deny boarding to a passenger for that reason.

**United's User Fee Collection**

20. United is the second largest U.S. air carrier and one of the world's largest international air carriers based in the United States. With its regional partners operating as United Express and Ted, United offers more than 3,700 daily flights serving more than 210 locations in the United States, the Asia-Pacific region, Europe, Latin America, and elsewhere. In addition, United provides ticketing services to individuals for travel on United flights by various distribution channels. As such, United is responsible for collecting Immigration User Fees and APHIS User Fees from international passengers pursuant to the two statutory schemes, as well as a myriad of additional fees and assessments imposed by the United States, other governments, and airports.

21. United has taken its commitment toward collection of such user fees seriously. Within the domestic and foreign legal framework discussed above, United has instituted policies and procedures to achieve the highest possible user fee collection rate. For example, United has a process (the "add-collect" process) that it uses to collect user fees from passengers who did not pay the user fees at the time of sale.

22. Notwithstanding the statutory and practical difficulties carriers experience at home and abroad, the Government's own auditors have found that United has achieved a high

degree of success with collection rates of user fees for the periods at issue ranging from more than 97 percent to more than 99 percent. These percentages do not take into account additional user fees that United collected through the add-collect process. Accordingly, United's actual collection rates are even higher.

23. Despite United's near-perfect collection rate, the Government asserts that it can hold United liable for any uncollected Immigration User Fees and APHIS User Fees. However, the Government has no statutory or regulatory authority to require remittance by United of any such uncollected fees.

**The Government's Audits**

24. The Government has audited United's compliance in connection with the Immigration User Fee and the APHIS User Fee for audit periods beginning before 1998 on approximately a biannual basis ("User Fee Audits").

25. In connection with the User Fee Audits, the Government tested for collection, recording, reporting, and remittance compliance.

26. For each of the User Fee Audits, the Government tested United's user fee collection compliance by reviewing United-issued tickets from a sampling of United flights during the relevant period. The Government then checked each ticket for evidence that the user fees had been collected. Any ticket lacking such evidence (and for which United could not produce any other evidence that the fees had been collected or that the passenger was exempt from the fees) was deemed an "error" by the Government auditors.

27. For each User Fee Audit, the Government auditors then calculated an "error rate" by dividing the number of "errors" by the total number of qualifying tickets in the sample.

28. For each User Fee Audit, the Government auditors then used the "error rate" to assess a liability against United.

29. The auditors applied the "error rate" to the total dollar amount of applicable Immigration User Fees or APHIS User Fees that United had remitted during the period covered by the audit.

30. United has paid each of the assessments from each of these User Fee Audits.

**The Immigration User Fee Audit For January 1, 1999, Through June 30, 2000**

31. On or about September 11-15, 2000, the Government audited United in connection with Immigration User Fee remittances for the period January 1, 1999, through June 30, 2000.

32. The Government auditors found that United remitted $51,843,480 in Immigration User Fees during the audit period.

33. Using the sampling methodology described above, the Government's audit personnel audited United's passenger tickets for the audit period and concluded there were 49 "errors" out of 1,671 qualifying sampled tickets, which translated to an "error rate" of 2.93 percent.

34. The auditors applied this "error rate" to the amount of Immigration User Fees remitted by United during the audit period and calculated an additional Immigration User Fee liability of $1,581,255.

35. During the audit, the Government auditors reviewed documentation regarding United's add-collect process and examined lists of special service ticket numbers showing the amounts of the Immigration User Fees collected through that process. Because of these

Immigration User Fees collected through the add-collect process, the Government auditors allowed United a $264,104 credit against the total extrapolated underpayment of $1,581,255. This $264,104 represents Immigration User Fees that United collected after the time of sale and which therefore had no indication of payment on the original ticket.

36. The Government auditors also allowed United a $88,369 credit because the "error rate" was not applicable to employee passes or frequent flyer award tickets, which were dealt with separately.

37. After reducing the $1,581,255 by $264,104 and $88,369, the Government assessed United $1,228,783.

38. In response to this assessment, United paid a total of $1,228,783 to the Government ($1,176,308 on or about October 19, 2000; $18,189 on or about October 30, 2000; and $34,286 on or about December 14, 2000).

**<u>The Immigration User Fee Audit For July 1, 2000, Through June 30, 2002</u>**

39. On or about August 19-22, 2002, the Government audited United in connection with Immigration User Fee remittances for the period July 1, 2000, through June 30, 2002.

40. The Government auditors found that United remitted $74,194,710 in Immigration User Fees during the audit period.

41. Using the sampling methodology described above, the Government's audit personnel audited United's passenger tickets for the audit period and concluded there were 14 "errors" out of 2,297 qualifying sampled tickets, which translated to an "error rate" of 0.61 percent.

42. The auditors applied this "error rate" to the amount of Immigration User Fees

remitted by United during the audit period and calculated an additional Immigration User Fee liability of $455,365.

43. During the audit, the Government auditors reviewed documentation regarding United's add-collect process and examined lists of special service ticket numbers showing the amounts of the Immigration User Fees collected through that process. Because of these Immigration User Fees collected through the add-collect process, the Government auditors allowed United a $156,817 credit against the total extrapolated underpayment of $455,365. This $156,817 represents Immigration User Fees that United collected after the time of sale and which therefore had no indication of payment on the original ticket.

44. The Government auditors also allowed United a $23,489 credit because the "error rate" was not applicable to employee passes or frequent flyer award tickets, which were dealt with separately.

45. After reducing the $455,365 by $156,817 and $23,489, the Government assessed United $275,059.

46. In response to this assessment, United paid a total of $275,059 to the Government ($274,487 on or about October 15, 2002; and $572 on or about November 15, 2002).

**The APHIS User Fee Audit For July 1, 1998, Through June 30, 2000**

47. On or about September 11-15, 2000, the Government audited United in connection with APHIS User Fee remittances for the period July 1, 1998, through June 30, 2000.

48. The Government auditors found that United remitted $22,022,529.15 in APHIS User Fees during the audit period.

49. Using the sampling methodology described above, the Government's audit

personnel audited United's passenger tickets for the audit period and concluded there were 47 "errors" out of 1,671 qualifying sampled tickets, which translated to an "error rate" of 2.81 percent.

50. The auditors applied this "error rate" to the amount of APHIS User Fees remitted by United during the audit period and assessed an additional APHIS User Fee liability of $442,427.

51. In response to this assessment, on or about October 19, 2000, United paid $442,427 to the Government.

**The APHIS User Fee Audit For July 1, 2000, Through June 30, 2002**

52. On or about August 19-23, the Government audited United in connection with APHIS User Fee remittances for the period July 1, 2000, through June 30, 2002.

53. The Government auditors found that United remitted $30,880,086.20 in APHIS User Fees during the audit period.

54. Using the sampling methodology described above, the Government's audit personnel audited United's passenger tickets for the audit period and concluded there were 14.21 "errors" out of 2,298 qualifying sampled tickets, which translated to an "error rate" of 0.62 percent.

55. The auditors applied this "error rate" to the amount of APHIS User Fees remitted by United during the audit period and calculated an additional APHIS User Fee liability of $181,127.

56. During the audit, the Government auditors reviewed documentation regarding United's add-collect process and examined lists of special service ticket numbers showing the

amounts of the APHIS User Fees collected through that process. Because of these APHIS User Fees collected through the add-collect process, the Government auditors allowed United a $71,387 credit against the total extrapolated underpayment of $181,127. This $71,387 represents APHIS User Fees that United collected after the time of sale and which therefore had no indication of payment on the original ticket.

57. After reducing the $181,127 by $71,387, the Government assessed United $109,740.

58. In response to this assessment, on or about October 15, 2002, United paid $109,740 to the Government.

**COUNT I**
**(Illegal Exaction of Immigration User Fees)**

59. Plaintiff incorporates paragraphs 1 through 46 above.

60. The Government has misinterpreted and misapplied its statutory and regulatory authority relating to the collection and remittance of Immigration User Fees by compelling United to pay user fees that should have been paid by United's passengers. The Government has imposed such financial liability on United without either statutory or regulatory authority to do so.

61. There is neither statutory nor regulatory authority that imposes secondary liability on United for uncollected Immigration User Fees nor that requires United to guarantee the collection of such fees. Furthermore, there is neither statutory nor regulatory authority for the Government to require the remittance of uncollected Immigration User Fees by United.

62. The aforementioned amounts that the Government assessed against United in 2000 and 2002 for uncollected Immigration User Fees were illegally exacted.

**COUNT II**
**(Illegal Exaction of APHIS User Fees)**

63. Plaintiff incorporates paragraphs 1 through 30 and 47 through 58 above.

64. The Government has misinterpreted and misapplied its statutory and regulatory authority relating to the collection and remittance of APHIS User Fees by compelling United to pay user fees that should have been paid by United's passengers. The Government has imposed such financial liability on United without either statutory or regulatory authority to do so.

65. There is neither statutory nor regulatory authority that imposes secondary liability on United for uncollected APHIS User Fees nor that requires United to guarantee the collection of such fees. Furthermore, there is neither statutory nor regulatory authority for the Government to require the remittance of uncollected APHIS User Fees by United.

66. The aforementioned amounts that the Government assessed against United in 2000 and 2002 for uncollected APHIS User Fees were illegally exacted.

**PRAYER FOR RELIEF**

WHEREFORE, United prays for judgment in its favor against the United States as follows:

(a) for judgment awarding Plaintiff damages caused by the Government's illegal exactions of uncollected Immigration User Fees, including, but not limited to, reimbursement of all the funds illegally exacted by the Government;

(b) for judgment awarding Plaintiff damages caused by the Government's illegal exactions of uncollected APHIS User Fees, including, but not

limited to, reimbursement of all the funds illegally exacted by the Government;

(c) for judgment awarding Plaintiff any and all other damages to which it is entitled by law;

(d) for judgment awarding Plaintiff costs and interest as allowed by law; and

(e) for judgment awarding such other and further relief as this Court deems just.

Respectfully submitted,

Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W.
Washington, D.C. 20005
(202) 626-6087
(202) 626-5801 (Facsimile)

Counsel for Plaintiff

Dated: September 11, 2006